**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-90393 (CML)** |
| | § | |
| **VIRIDIS CHEMICAL, LLC,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |
| | § | **(Emergency Hearing Requested)** |

**DECLARATION OF PATRICK D. KILLIAN IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Patrick D. Killian, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1.       I am the chief executive officer ("***CEO***") of Viridis Chemical, LLC, a limited liability company organized under Delaware law ("***Viridis***," and together with its debtor affiliates, the "***Company***").

2.       I joined the Company in April 2024 and have served as CEO since that time.  As a result, I am familiar with the Company's day-to-day operations, business and financial affairs, books and records, and employees.  I hold a bachelor's degree in chemical engineering from Cornell University and a Master of Business Administration from The University of Michigan.  I have over thirty years of experience in the chemical industry, having served as Vice President of Strategy and Marketing at Monument Chemical prior to joining the Company.  Prior to my work at Monument Chemical, I worked as a Global Business Director at Dow Chemical.

3.       On the date hereof (the "***Petition Date***"), each of the above-captioned debtors (collectively, the "***Debtors***") filed voluntary petitions for relief under chapter 11 of title 11 of the

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Viridis Chemical, LLC (0523); Viridis Chemical Payroll Holdings, LLC (2597); Viridis Chemical Payroll, LLC (4042); Viridis Chemical NE Asset Co 1, LLC (6489); and Viridis Chemical NE Asset Co 2, LLC (0436).  The location of the Debtors' corporate headquarters and the Debtors' service address is:  4582 Kingwood Drive, Suite E #152, Kingwood, Texas 77345.

United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Court***").

4.       I am authorized to submit this Declaration on behalf of the Debtors.  I am over 21 years of age, and, if called upon to testify, I would testify competently to the facts and opinions set forth herein.  All facts and opinions set forth in this declaration (the "***Declaration***") are based upon:  (i) my knowledge of the Debtors' day-to-day operations, business and financial affairs, books and records, and employees; (ii) information I learned from my review of relevant documents, including unaudited financial documents; (iii) information supplied to me or verified by other members of the Company's management and its third-party advisors; and/or (iv) my experience and knowledge concerning the chemicals industry generally.   Unless otherwise indicated, any financial information contained in this Declaration is subject to change but is true and correct to the best of my knowledge as of the date of this Declaration.   Such financial information is presented on a consolidated basis for the Debtors, except where specifically noted.

5.       The Debtors have filed contemporaneously with this Declaration certain motions seeking "first day" relief (collectively, the "***First Day Motions***") to minimize possible adverse effects of the chapter 11 filings on the Debtors' businesses.  I have reviewed the First Day Motions, and I believe the relief requested therein is necessary to avoid immediate and irreparable harm to the Debtors' businesses, estates, and stakeholders resulting from the filing of these chapter 11 cases (the "***Chapter 11 Cases***").   As set forth below and described in greater detail in the First Day Motions, I also believe that without immediate access to cash collateral and authority to make certain essential payments on account of prepetition claims, the Debtors would suffer immediate and irreparable harm to the detriment of their businesses, estates, and stakeholders.

4909-6736-9107

6.     This Declaration is organized into four parts.   Part I provides background information on the Company and its operations.   Part II provides an overview of the Debtors' prepetition capital structure.   Part III describes the challenges the Company has faced and strategies the Company has implemented in response to such challenges.   Part IV and **Exhibit A** attached to this Declaration summarize the relief requested in and the factual bases supporting the First Day Motions.

## I.     THE COMPANY'S BUSINESSES

### A.     The Company's History

7.     Founded in 2021, Viridis is a privately held company and a developer of bio-based, low-carbon chemical technology for the production of ethyl acetate.   As one of only three ethyl acetate plants in the United States, Viridis has developed a proprietary "Prairie Green™ catalytic process" to produce ethyl acetate using only 100% corn-based ethanol.   Ethyl acetate is a safe and effective solvent that is common in modern manufacturing.   It is used in everything from paints, coatings, and packaging to household goods, pharmaceuticals, and personal care products like nail polish.   Ethyl acetate is widely used across the United States and Europe due to its low toxicity profile and strong price-performance characteristics.

8.     Viridis was originally founded by its private equity sponsors, an affiliate[2] of EIV Capital ("***EIV***") and a minority investor (the "***Minority Investor***"), for the purpose of acquiring the plant assets and intellectual property of Prairie Catalytic, LLC ("***Prairie Catalytic***"), a subsidiary of Greenyug, LLC ("***Greenyug***"), which had developed the original patent for renewable ethyl acetate.   Prairie Catalytic completed construction of a chemical manufacturing plant in Columbus, Nebraska (the "***Nebraska Plant***") in 2019, adjacent to an Archer Daniels

---

[2]     The EIV affiliate is EIV Viridis Chemical, LLC.

Midland ("**ADM**") ethanol plant, but was unable to bring the plant to commercial operation because it was later determined that the ADM plant could not make an ethanol supply that was pure enough for the Nebraska Plant's needs.  Viridis purchased the assets of Prairie Catalytic out of a receivership in 2021 for $8 million in cash and a $4 million Subordinated Unsecured Note (as defined below), with the goal of reviving and improving the plant's operations.

### B.     The Company's Operations

#### 1.     The Company's Product

9.      Through the Company's proprietary Prairie Green™ catalytic process, the Company is able to produce ethyl acetate using only 100% corn-based ethanol instead of hydrocarbon feedstocks.  The main byproducts in this process are water and hydrogen gas, which are reused as heating fuel in the plant, further reducing the hydrocarbon consumption compared to other ethyl acetate producers.  As such, the Prairie Green™ process results in approximately 80% lower emissions, fewer downstream concerns, and a lower carbon footprint compared to conventional ethyl acetate production.

10.     Ethyl acetate is a versatile, low-toxicity solvent widely used across the modern manufacturing industry.  Nearly 30 years ago, industry participants began moving away from hydrocarbon-based solvents, and ethyl acetate became the leading replacement.  The Company's target customers are already consumers of ethyl acetate: companies in the coatings, packaging, and consumer products industries.

11.     The Company has only two North American competitors and competes with a limited group of foreign companies that provide imported ethyl acetate to the North American market.  The Viridis plant is expected to reduce that volume of imports and provide supplier diversity to customers currently relying on the two North American incumbents.  At full capacity,

4

the plant is expected to produce roughly 100 million pounds of ethyl acetate per year.  The plant is designed to run continuously.

2.    *Initial Operations and Plant Relocation*

12.    Following the acquisition of Prairie Catalytic's assets, the Company was able to bring the Nebraska Plant to limited operations despite the inability to use ethanol from the neighboring ADM facility by sourcing railcar supply of corn-based, pharmaceutical grade ethanol from an ethanol plant owned by BioUrja Renewables, LLC ("**BioUrja**") located in Peoria, Illinois. This demonstrated to investors that the Nebraska Plant could operate and produce a commercially viable product.  During that period, the Company's renewable ethyl acetate was quality tested and approved for purchase by nearly 40 customers in the United States and Europe.

13.    However, the Nebraska Plant experienced persistent operational challenges and could not achieve sustainable, cost-competitive operations without access to lower cost or on-site purified ethanol, which was not available at the Nebraska location.  An expensive construction project would have been required to purify the ethanol feed at the Nebraska Plant and, even if completed, the Nebraska Plant would still not have been cost-effective due to unfavorable utility, shipping, and selling costs associated with the Nebraska location.

14.    In light of these challenges, the Company made the strategic decision to relocate the plant from Columbus, Nebraska to Peoria, Illinois, announcing the move in November 2024. The relocation was initiated to improve the cost of utilities, wastes, product shipping and storage, as well as additional product storage and other plant improvements that were made to help ensure that the plant can achieve its full production volume in the future, with a projected margin expansion exceeding 20%, and to position the Company closer to its expected core customer base. The core of the strategy change was a set of long-term agreements between BioUrja and Viridis to re-locate the plant to available land on their large Peoria site, including a long-term ethanol supply

agreement, services including utilities and waste water treatment, and assistance with loading and shipping products. Importantly, in Peoria, the Company also leases land from BioUrja and the plant will be strategically co-located with BioUrja's high-purity, corn-based ethanol plant, which will enable more efficient and sustainable production of the Company's renewable ethyl acetate. This location and these contracts also enable Viridis to reduce upfront investment costs by contracting with BioUrja for services such as shipping, cooling water, and waste-water treatment. The Peoria site offers access to major rail lines and barge-navigable routes connecting to the US Inland Waterways (Illinois, Mississippi Rivers and Great Lakes), giving Viridis close proximity to core ethyl acetate customers in the Midwest and Northeast, and the ability to ship by water to Europe and other world markets in the future.



*The Peoria Site*

15.     To effectuate the move of the plant from Nebraska to Peoria, Viridis entered into a master services agreement with Sterling Global Industries, LLC ("***Sterling***" and such agreement, the "***Sterling Contract***") in January 2025 to act as general contractor on the project.  Disassembly of the Nebraska Plant began in January 2025, and the majority of the plant components and equipment were on site in Peoria by summer 2025.  Notably, as described in greater detail below, work on the reconstruction of the plant in Peoria has been paused, and the Company therefore currently has no business operations and is generating no revenue.



*The Peoria Plant*

### 3.     *The Company's Management*

16.     The Company is led by an experienced management team comprised of the following members:

| Name | Years of Industry Experience | Title |
|---|---|---|
| Patrick Killian | 31 | Chief Executive Officer |
| Mark Barta | 14 | Chief Financial Officer |

17.     As of the Petition Date, the Debtors employ ten individuals on a full-time or part-time basis.  The Company's management team is supported by employees who are vital to the completion of the plant, the Company's future business operations, and these Chapter 11 Cases. Their skills, knowledge, and understanding of the Company's business and technology are essential to preserving and maximizing the value of the Company.

**C.     The Company's Organizational Structure**

18.     The Company's organizational structure consists of five entities.  All of the Company entities are Debtors in these Chapter 11 Cases.   The following is a simplified organization chart of the Company:



### 1. The Debtors

19.     The Company's operations are conducted through Viridis Chemical, LLC ("***Viridis Chemical***") a Delaware limited liability company with its principal place of business in Kingwood, Texas, which serves as the primary operating entity.  Viridis Chemical holds the company's main operating and money market bank accounts, is the issuer of the Company's Secured Notes and Subordinated Unsecured Notes (each defined below), and holds the Company's intellectual property.

20.     Viridis Chemical directly holds 100% of the equity in each of Viridis Chemical Payroll Holdings, LLC ("***Viridis Payroll Holdings***"), a Delaware limited liability company, Viridis Chemical NE Asset Co 1, LLC ("***Viridis Asset Co 1***"), a Delaware limited liability company, and Viridis Chemical NE Asset Co 2, LLC ("***Viridis Asset Co 2***"), a Delaware limited liability company.  Additionally, Viridis chemical directly holds 99% of the equity of Viridis Chemical Payroll, LLC ("***Viridis Payroll***").

21.     Viridis Payroll Holdings is a holding company and has no material investments or ownership interests other than its direct ownership of 1% of the equity interests of Viridis Payroll.

Viridis Payroll and the Debtors' co-employer, Insperity PEO Services, L.P., employ the Company's employees.

22.    Viridis Asset Co 1 is a guarantor under the Secured Notes and holds assets related to the former Nebraska Plant, including the real property on which it previously sat and certain equipment stored in Nebraska.  Viridis Asset Co 2 is a guarantor under the Secured Notes and has no material investments or ownership interests.

## II.    PREPETITION CAPITAL STRUCTURE[3]

23.    As of the Petition Date, the Debtors' funded debt liabilities total approximately $17.3 million, including approximately (i) $13.5 million in outstanding principal and (ii) $3.8 million in accrued and unpaid interest.  The Debtors' funded debt obligations include:

| Facility | Maturity | Total Approx.  Principal Amount Outstanding |
|---|---|---|
| Secured Notes | September 2025 | $10.0 million |
| *Total Funded Secured Debt* | | **$10.0 million** |
| Subordinated Unsecured Notes | September 2025 | $3.5 million |
| *Total Funded Debt* | | **$13.5 million** |

### A.    Note Purchase Agreement

24.    Pursuant to that certain *Note Purchase Agreement* (the "***Note Purchase Agreement***") for the senior secured convertible promissory notes (collectively, the "***Secured Notes***"), dated as of August 8, 2023 (collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "***Secured Notes Documents***") by and among Viridis, as issuer, Viridis Chemical NE Asset Co

---

[3]    The following description of the Debtors' prepetition capital structure is for informational purposes only and is qualified in its entirety by reference to the Note Purchase Agreement and the Subordinated Unsecured Note and other documents setting forth the specific terms of such obligations.

1, LLC and Viridis Chemical NE Asset Co 2, LLC, as subsidiary guarantors (together with Viridis, the " ***Secured Notes Parties***"), affiliates[4] of EIV and the Minority Investor (in such capacities, the "***Secured Noteholders***"),[5] as purchaser parties thereto, and EIV Viridis Chemical, LLC, as the collateral agent, Viridis issued the Secured Notes to the Secured Noteholders under the Secured Notes Documents.  The Secured Notes are secured by interests and/or liens on substantially all of the assets of the Secured Notes Parties, in each case as described more fully in the Secured Notes Documents.`

25.     Interest on the Secured Notes is 12% per annum while no default has occurred, and 15% upon the occurrence and during the continuance of an event in default.  As of the Petition Date, the Debtors' aggregate principal outstanding funded debt obligations under the Secured Notes total approximately $10.0 million, plus accrued and unpaid interest, fees, premiums (including prepayment premiums), expenses, disbursements, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, chargeable, or reimbursable under the Secured Notes Documents incurred in connection therewith as provided in the Secured Notes Documents.

### B.     Subordinated Note

26.     In connection with the Company's purchase of Prairie Catalytic, Prairie Catalytic's court-appointed receiver agreed to accept an unsecured subordinated note to Viridis in the principal amount of $4 million (the "***Subordinated Unsecured Note***").  The Subordinated Unsecured Note is documented in that certain *Subordinated Promissory Note*, dated as of February 5, 2021 (collectively with any other agreements and documents executed or delivered in connection

---

[4]     The EIV affiliate is EIV Viridis Chemical, LLC.

[5]     EIV Viridis Chemical, LLC is the majority Secured Noteholder (in such capacity, the "***Majority Secured Noteholder***").

therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "***Subordinated Unsecured Notes Documents***"), among Viridis and the noteholders[6] party thereto (the "***Subordinated Noteholders***"), and is subordinated to the Note Purchase Agreement via an Intercreditor Agreement, dated as of March 7, 2025, among the Subordinated Noteholders and the collateral agent under the Secured Notes.

27.     Interest on the Subordinated Unsecured Note accrues on the unpaid principal balance at a rate of 7% per annum.  As of the Petition Date, the Debtors' aggregate principal outstanding unsecured debt obligations under the Subordinated Unsecured Note total approximately $3.5 million, plus accrued and unpaid interest incurred in connection therewith as provided in the Subordinated Unsecured Notes Documents.

### C.     Trade Vendors and Other Unsecured Liabilities

28.     In the ordinary course of business, the Debtors have historically relied on numerous trade vendors to operate their businesses, including with respect to the relocation of the plant. These trade vendors include suppliers of engineering, construction, and equipment services for the reconstruction of the Debtors' plant in Peoria.  As a result of the Debtors' business with these trade vendors, the Debtors estimate they may owe up to approximately $4.0 million in unsecured trade claims as of the Petition Date.  As described in further detail below, Sterling and various subcontractors have asserted mechanics' liens on account of purported claims totaling approximately $6.5 million.  Such liens and asserted claim amounts are disputed and are under

---

[6]     The Subordinated Noteholders are Simmons Bank, Lapis Advisers, LP, and the United States Department of Agriculture Rural Development.

review by the Company, but to the extent such liens and claims are valid, these amounts may be secured and the amount of estimated unsecured trade claims may be lower.

### D.      Equity Interests in Viridis

29.     EIV holds approximately 87.9% of Viridis' common stock and approximately 93% of Viridis' Class A preferred stock.  The Minority Investor holds approximately 12% of Viridis' common stock and approximately 7% of Viridis' Class A preferred stock.  The remaining approximately 0.1% of Viridis' common stock is held by management.  Historically, Viridis performed capital calls approximately every three months.

## III.    EVENTS LEADING TO THE CHAPTER 11 CASES

### A.      Challenges Facing the Company

30.     The relocation of the plant to Peoria, Illinois was originally expected to be completed by December 2025.  However, the Company has experienced significant cost overruns and construction delays that have ultimately rendered completion of the Peoria plant project unfeasible absent additional capital.  In addition to cost overruns associated with the construction, the Company faced unforeseen additional costs related to (i) additional regulatory requirements associated with locating the plant in an urban area, (ii) unexpected equipment maintenance, (iii) increased transportation costs, and (iv) the imposition of tariffs on Indian steel imports, among other costs.

31.     Additionally, while the majority of the plant components and equipment arrived on-site in Peoria from the Nebraska Plant in summer 2025, the Company decided to replace a key component – the dehydration system responsible for removing water from the ethanol stream – due to reliability issues with the existing system at the Nebraska Plant.  The Company contracted with an India-based company – the only company in the world that could supply a dehydration system of the required size and specifications – to design and construct replacement equipment

that would be imported from India in roughly 20 shipping containers, then reassembled and integrated with the plant at the Peoria site.  However, the delivery of the dehydration unit was unexpectedly delayed due to the imposition of new tariffs and transportation logistics. Accordingly, while certain pieces of the dehydration unit have been delivered to Peoria, some pieces of the dehydration unit currently sit in shipping containers in a bonded warehouse in the port of entry in Houston.  Notably, the plant cannot function without this key component.

32.     The Sterling Contract is a "time and materials" master services agreement, with work to be completed pursuant to multiple purchase orders agreed to by the Company and Sterling. The initial total budgeted cost of construction of the Peoria plant was approximately $26.7 million, with the estimate for the total "Project Scope" in the Sterling Contract being approximately $14.9 million.[7]  However, the actual cost increased significantly over time, well in excess of the budget.

33.     Due, in part, to multiple replacements of Sterling's project manager, reports regarding costs associated with the project were inconsistent in their frequency, content, and quality, and the project forecasts began to increase.  In July 2025, Sterling began presenting invoices for work completed that were significantly higher than any forecast.  Ultimately, the Company paid Sterling a total of $21.5 million from January 2025 through December 2025. Sterling asserts, and the Company disputes, that the Company still owes Sterling an additional approximately $6.1 million on account of work Sterling did at the plant site, approximately half of which the Company submits was on account of unapproved expenses incurred outside of purchase orders.  As described below, completion of the plant is expected to require several more million dollars, vastly in excess of the original budget.

---

[7]     The remaining portion of the budget was related to the dehydration unit, disassembly of the Nebraska Plant, transportation of the component parts from Columbus, Nebraska to the Peoria site, and other work that Sterling was not directly responsible for.

34.     On February 6, 2026, Sterling recorded a mechanics' lien in Peoria County (the "**Sterling Lien**") on not only the property the Debtors lease from BioUrja, but also on what appears to be the entire BioUrja property, including the portion on which BioUrja's own plant is located, to secure its asserted claim of approximately $6.1 million against the Company.[8]  The Company reserves all rights with regard to, and likely will contest, the amount and validity of the Sterling Lien, and Viridis will continue its investigation into this matter over the coming weeks.

35.     Amidst cost overruns, Viridis was also faced with broader weakness in the chemical market and ethyl acetate market pricing deteriorated significantly.  In the second half of 2025, the price difference between ethyl acetate and ethanol, known as the "spread," fell by ~26%.  Given the market distress, significant cost overruns and construction delays, the Company made the decision to pause construction in December 2025 and turn its efforts to liquidity preservation while exploring strategic alternatives.  This, in turn, resulted in pausing vendor payments – including to Sterling – while the Company evaluated its path forward.

### B.     Prepetition Liquidity Preservation Strategies

36.     Because it is not currently operational, the Company has primarily depended on borrowings under its Note Purchase Agreement and capital calls from its equity holders as its source of cash and liquidity.  Yet, the Company has significant accrued and outstanding unsecured trade debt, largely comprised of unpaid obligations to vendors and contractors who supplied equipment and engineering and construction services for the Peoria plant reconstruction.

37.     In light of these balance sheet and liquidity challenges, the Company's management took swift actions to preserve capital beginning in December 2025, including immediate cessation

---

[8]     In addition to the Sterling Lien, various subcontractors have since asserted mechanics liens against Viridis and BioUrja in the month leading up to the Petition Date.

of construction activity at the Peoria plant, laying off employees, pausing vendor payments, and delaying certain tariff and domestic shipping costs by placing the dehydration unit in a bonded warehouse at the port of entry.

C.  **Hiring Advisors and Exploring Strategic Alternatives to Maximize Value**

38.     In December 2025, the Company identified and appointed Mark McDermott, a former restructuring lawyer at an international law firm with over three decades of experience, as an independent member of the board of managers of Viridis (the "***Board***") and subsequently appointed him as the sole member of a newly formed special committee of the Board (the "***Special Committee***").  Mr. McDermott, as the sole member of the Special Committee, is tasked with reviewing potential transactions and making recommendations to the Board related to the same, and is delegated with binding decision-making authority with respect to matters that constitute, or are reasonably likely to constitute, a conflict of interest between Viridis and its related parties. Also in December 2025, the Company engaged Carl Marks Advisors ("***CMA***") as financial advisor to assist with forecasting cash flow and analyzing and managing liquidity.

39.     In early February 2025, the Company engaged Vinson & Elkins LLP as legal counsel to advise on strategic alternatives.  Around the same time, the Company further engaged CMA in an additional role as investment banker to work with the Company on exploring all available options to preserve and maximize value, including running a process to seek additional capital investment or, alternatively, sell the Company or its assets.  In addition, the Company engaged Zachry Group as engineering consultant to conduct a study and produce a report detailing the estimated cost and timeline required to complete construction the Peoria plant, with a preliminary report projected to be available in mid-March 2026 and a final report to follow.

40.     In mid-February 2026, the Company, with the assistance of CMA, began a process (the "***Investor Outreach Process***") to identify and generate investor interest for an investment or

other transaction that would allow the Company to complete construction and return to operations. During the Investor Outreach Process, the Debtors, with the assistance of CMA, spent significant time preparing marketing materials and began soliciting interest from a significant number of financial and strategic parties that were identified as the most likely to be interested in a potential transaction with the Debtors.  These efforts are ongoing as of the Petition Date.

41.     Notwithstanding significant efforts by the Debtors to explore viable alternatives, the Debtors face a diminishing liquidity position with no current operations to fund working capital and have been in payment default on the Company's funded debt since September 2025.  These challenges, plus the assertion of the Sterling Lien and various subcontractor mechanics liens made continued out-of-court efforts to maximize value untenable.  In light of these circumstances, the Debtors' board of managers and members, as applicable, determined that the best option to preserve and maximize value, and to avoid a potential free-for-all race to the courthouse by various creditor constituencies, was to seek the protection afforded by chapter 11 of the Bankruptcy Code.

42.     The Debtors believe the tools afforded by the Bankruptcy Code and the transparency afforded by the chapter 11 process will provide them with the necessary breathing spell to continue working with Zachry Group to ascertain the estimated cost and timeline required to complete construction the Peoria plant and run a robust process to attract one or more investors to provide new capital to complete the plant and resume operations or otherwise purchase the Company's assets, which the Debtors believe is their best path for maximizing value for the benefit of their stakeholders.  Additionally, the Debtors continue to explore options for postpetition financing in order to ensure the Debtors have the runway and liquidity to run a robust sale process for the benefit of all stakeholders.

## IV.     FIRST DAY MOTIONS

43.     Contemporaneously with this Declaration, the Debtors have filed several First Day Motions seeking orders granting various forms of relief intended to facilitate a smooth and efficient transition into bankruptcy and administration of these Chapter 11 Cases.  I have reviewed each of the First Day Motions, and I believe that the relief requested therein is necessary to allow the Debtors to run a value maximizing Investor Outreach Process with minimal disruption during the pendency of these Chapter 11 Cases.  The Debtors intend to seek entry of Court orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules for the United States Bankruptcy Court for the Southern District of Texas.  For each First Day Motion in which the Debtors have sought relief on an emergency basis, if the Court declines to grant the relief requested therein, I believe that the Debtors will suffer immediate and irreparable harm for the reasons stated in the First Day Motions and in **Exhibit A** attached hereto.

44.     A description of the relief requested and the facts and opinions supporting each of the First Day Motions is detailed in **Exhibit A** attached hereto.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 8, 2026

/s/ Patrick D. Killian
Patrick D. Killian

4909-6736-9107

<u>**EXHIBIT A**</u>

**Evidentiary Support for First Day Motions[1]**

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Declaration and/or the applicable First Day Motions.

4909-6736-9107

I.      **ADMINISTRATIVE MOTIONS**[1]

     A.      **Emergency Motion For Entry of an Order Directing Joint Administration of The Debtors' Chapter 11 Cases (the "*Joint Administration Motion*")**

     1.      In the Joint Administration Motion, the Debtors seek entry of an order consolidating the administration of these Chapter 11 Cases for procedural purposes only as follows:

     a.      the Office of the United States Trustee for the Southern District of Texas (the "*U.S. Trustee*") shall conduct joint informal meetings with the Debtors, as required, and, unless otherwise directed by the Court, to the extent required, a joint first meeting of creditors;

     b.      one plan and disclosure statement may be filed for all of the Debtors by any plan proponent; however, substantive consolidation of the Debtors' estates is not being requested at this time;

     c.      unless otherwise required by the Court, to the extent the Debtors are required to file schedules of assets and liabilities and statements of financial affairs, each Debtor will file separate schedules of assets and liabilities, statements of financial affairs, and lists of equity security holders;

     d.      proofs of claim filed by creditors of any Debtor shall reflect the caption and case number of the Debtor to which the claim relates and in which chapter 11 case such claim is to be filed; and

     e.      a separate claims register shall be maintained for each Debtor.

     2.      The Debtors respectfully request that the Court maintain one file and one docket for all of the jointly administered cases under the lead case of Viridis Chemical, LLC and that the Court administer these chapter 11 cases (the "*Chapter 11 Cases*") under a consolidated caption, as follows:

---

[1]      Each defined term used in this Exhibit A shall only be applicable to the specific section where it is defined.

| | | |
|---|---|---|
| In re: | § | Case No. 26-90393 (CML) |
| | § | |
| VIRIDIS CHEMICAL, LLC, *et al*., | § | (Chapter 11) |
| | § | |
| Debtors.[2] | § | (Jointly Administered) |

3.    The lead case docket, as well as the dockets for each of the other chapter 11 cases, will be available on the website of the Debtors' proposed claims, noticing, and solicitation agent at https://dm.epiq11.com/viridischemical.

4.    The Debtors also request that a notation substantially similar to the following be entered on each of the Debtors' respective dockets (other than Debtor Viridis Chemical, LLC) to reflect the joint administration of these Chapter 11 Cases:

5.    An order has been entered in this case in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of Texas directing the joint administration of the Chapter 11 Cases of Viridis Chemical, LLC; Viridis Chemical Payroll Holdings, LLC; Viridis Chemical Payroll, LLC; Viridis Chemical NE Asset Co 1, LLC; and Viridis Chemical NE Asset Co 2, LLC.  The docket in Case No. 26-90393 (CML) should be consulted for all matters affecting these cases.  All further pleadings and other papers shall be filed in and all further docket entries shall be made in Case No. 26-90393 (CML).

6.    I understand that the Debtors anticipate that notices, applications, motions, other pleadings, hearings, and orders in these Chapter 11 Cases may affect all of the Debtors.  I believe that if each Debtor's case were administered independently, there would be a number of

---

[2]    The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are:  Viridis Chemical, LLC (0523); Viridis Chemical Payroll Holdings, LLC (2597); Viridis Chemical Payroll, LLC (4042); Viridis Chemical NE Asset Co 1, LLC (6489); and Viridis Chemical NE Asset Co 2, LLC (0436).  The location of the Debtors' corporate headquarters and the Debtors' service address is 4582 Kingwood Drive, Suite E #152, Kingwood, Texas 77345.

duplicative filings and overlapping service, which would be an unnecessary duplication of identical documents that would be wasteful of the resources of the Debtors' estates, as well as the resources of the Court and of other parties in interest.

7.     Joint administration will permit the Clerk of the Court to use a single general docket for all of the Debtors' Chapter 11 Cases and to combine notices to creditors and other parties in interest by ensuring that all parties in interest will be able to review one docket to stay apprised of the various matters before the Court regarding all of the Debtors' Chapter 11 Cases.  Moreover, supervision of the administrative aspects of the Debtors' Chapter 11 Cases by the U.S. Trustee will be simplified.  Therefore, I believe joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the U.S. Trustee, and the Court.

8.     I do not believe joint administration will give rise to any conflict of interest among the Debtors' estates, and I believe that the rights of the Debtors' respective creditors will not be adversely affected by the proposed joint administration because each of the Debtors will continue as separate and distinct legal entities, will continue to maintain separate books and records, and will provide information as required in the consolidated monthly operating reports on a debtor-by-debtor basis.  I further understand that each creditor may file a proof of claim against the applicable estate in which it allegedly has a claim or interest and will retain whatever claims or interests it has against the particular estate.  As such, I believe the recoveries of all creditors will be enhanced by the reduction in costs resulting from joint administration of the Debtors' Chapter 11 Cases. I also believe that the Court will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files.

9.      Based on the foregoing, I believe any delay in granting the relief requested in the Joint Administration Motion would hinder the Debtors' operations and cause immediate and irreparable harm.   Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Joint Administration Motion be approved.

**B.      Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix; (B) File a Consolidated List of 30 Largest Unsecured Creditors; (C) Redact Certain Personal Identification Information; (II) Approving Form and Manner of Notice of Commencement; and (III) Granting Related Relief  (the "*Consolidated Creditor Matrix Motion*")**

10.      By the Consolidated Creditor Matrix Motion, the Debtors seek entry of an order, substantially in the form attached hereto as Exhibit A: (i) authorizing the Debtors to (a) file a consolidated creditor matrix; (b) file a consolidated list of the 30 largest unsecured creditors; and (c) redact certain personal identification information; (ii) approving the form and manner of the notice of commencement of these Chapter 11 Cases; and (iii) granting related relief.

11.      The Debtors respectfully request authority to file a single list of their 30 largest general unsecured creditors (the "*Top 30 List*") on a consolidated basis.   Because the Top 30 Lists of the Debtors could overlap, and certain Debtors may have fewer than 30 significant unsecured creditors, I believe that filing separate Top 30 Lists for each Debtor would be of limited utility.   I further believe that a single consolidated Top 30 List would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.   In addition, I believe the exercise of compiling separate Top 30 Lists for each individual Debtor could consume an excessive amount of the Debtors' limited time and resources.   A single Top 30 List will also help alleviate administrative burden, costs, and the possibility of duplicative service. Accordingly, I believe that filing a consolidated Top 30 List is necessary for the efficient and orderly administration of these Chapter 11 Cases, appropriate under the facts and circumstances, and in the best interests of the Debtors' estates.

12.     The Debtors also request that certain personal identification information of the Debtors' employees and individual creditors of the Debtors be redacted from the Creditor Matrix because such information could be used to perpetrate identity theft or to harm such individuals. The Debtors propose to provide an unredacted version of the Creditor Matrix to the Court, the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases, counsel to the Majority Secured Noteholder, and any party in interest who, for cause, requests such information from the Debtors or the Court.

13.     The Debtors, through Epiq Corporate Restructuring, LLC, their proposed claims and noticing agent, propose to serve the notice of commencement substantially in the form attached to the Consolidated Creditor Matrix Motion as Annex A (the "***Notice of Commencement***") on all parties listed on the Creditor Matrix to advise them of the meeting of creditors under section 341 of the Bankruptcy Code. I believe providing service of the Notice of Commencement on the Creditor Matrix will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' Creditor Matrix and will preserve judicial resources and prevent creditor confusion through the efficient service of critical information. Accordingly, the Debtors submit that service of a single Notice of Commencement is warranted and appropriate in these Chapter 11 Cases.

14.     Based on the foregoing, I believe any delay in granting the relief requested in the Consolidated Creditor Matrix Motion would hinder the Debtors' operations and cause immediate and irreparable harm. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Consolidated Creditor Matrix Motion be approved.

**C.      Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "*Motion for Extension of Time to File Schedules*")**

15.      In the Motion for Extension of Time to File Schedules, the Debtors seek entry of an Order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "*Schedules and Statements*") by 30 days, for a total of 44 days from the Petition Date, through and including April 21, 2026.

16.      The Debtors submit that ample cause exists to grant the relief requested therein.  To prepare the Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to numerous creditors, assets, leases, and contracts from each Debtor entity.  I believe that accurate preparation of the Schedules and Statements will require a significant expenditure of time and effort on the part of the Debtors' employees.  Complying with the short timeline that I understand is granted under the Bankruptcy Code and the Bankruptcy Rules would place significant strain on the Debtors' financial team and would likely impact the Debtors' ability to maintain their normal operations.

17.      In the days leading up to the Petition Date, the primary focus of the Debtors' financial team has been preparing for these Chapter 11 Cases.  I believe focusing the attention of key personnel on critical chapter 11 compliance issues during the early days of these Chapter 11 Cases will facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates and all stakeholders.

18.      For all the reasons stated above, I believe that any delay in granting the relief requested in the Motion for Extension of Time to File Schedules would cause immediate and

irreparable harm. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Motion for Extension of Time to File Schedules be approved.

**D.      Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent (the "*Epiq Retention Application*")**

19.      The Debtors seek entry of an order authorizing the Debtors to employ Epiq Corporate Restructuring, LLC ("*Agent*") as claims, noticing, and solicitation agent (the "*Claims and Noticing Agent*") in accordance with the terms and conditions set forth in the engagement letter dated March 3, 2026 (the "*Engagement Letter*") attached as Exhibit B to the Epiq Retention Application.  The Application is supported by the *Declaration of Kate Mailloux in Support of Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* (the "*Declaration*") attached to the Epiq Retention Application as Exhibit C.

20.      The Debtors respectfully request approval to employ Agent to serve as Claims and Noticing Agent in their Chapter 11 Cases to provide the services outlined in the Engagement Letter.  I believe that Agent's employment is in the best interest of the estates, the Agent's rates are competitive and reasonable, and  the Agent has the expertise required in a complex chapter 11 case.   The Debtors request this Court authorize Agent's employment.

21.      The Debtors request that Agent's fees and expenses be paid as an administrative expense in the ordinary course of the Debtors' business without further application or order of the Court.  Should a dispute develop, the matter will be brought to the Court for resolution.  Agent agrees to maintain records of all services showing dates, categories of services, fees charged, and expenses incurred. Agent will provide a monthly invoice to the Debtors, Debtors' counsel, the U.S. Trustee, counsel for any official committee, and any party-in-interest who specifically requests

service of the monthly invoices.  Prior to the Petition Date, the Debtors provided Agent an advance in the amount of $25,000.  Agent will apply these funds in accordance with the Engagement Letter.

22.     The Debtors have agreed to indemnify the Agent as set forth in the Engagement Letter.  Notwithstanding anything to the contrary, the Agent will not be indemnified for liability arising out of gross negligence, willful misconduct, and certain other matters identified in the Order.

23.     I understand that the agent has reviewed its conflicts system to determine whether it has any relationships with the Debtors' creditors and parties-in-interest.  Except as disclosed in the Declaration, Agent represents that it neither holds nor represents any interest materially adverse to the Debtors' estates in connection with any matter on which it would be employed. Agent agrees that it will supplement its disclosure to the Court if any facts or circumstances are discovered that would require such additional disclosure.

24.     I believe the Epiq Retention Application should be granted because the Agent's services are required to effectuate the Debtor's transition into bankruptcy and to immediately begin providing effective notice of pleadings and orders to interested parties. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Epiq Retention Application be approved.

## II.     OPERATIONAL MOTIONS REQUESTING IMMEDIATE RELIEF

### A.     Emergency Motion for Entry of an Order (I) Authorizing the Debtors To (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue  Employee Benefits Programs, and (II) Granting Related Relief (the "*Wages Motion*")

25.     To avoid the immediate and irreparable harm to the Debtors' business operations and restructuring efforts that I believe would occur if the Debtors' employee obligations are not paid when due and if the Debtors' compensation and benefit programs are not continued in the

ordinary course of business—and to minimize personal hardship on the Debtors' employees—the Debtors seek, through the Wages Motion, entry of a final order (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs, and (b) granting related relief.

26.     As of the Petition Date, the Debtors employ nine people on a full time basis and one person on a part-time basis, all of whom receive a salary (the "***Employees***").  The Debtors also utilize two independent contractors (the "***Independent Contractors***," and together with the Employees, the "***Workforce***").  None of the Debtors' Employees are represented by a union or are subject to a collective bargaining agreement.

27.     The Workforce performs a wide variety of functions that are critical to the Debtors' operations and will be critical to the administration of these Chapter 11 Cases and to maximize the value of the Debtors' estates.  I believe their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving stability, safety, and efficiency.  Further, these Employees and the Independent Contractors are highly trained personnel with specialized skills who are not easily replaced.  Without the continued, uninterrupted services of the Workforce, I believe the Debtors' businesses will suffer immediate and irreparable harm.

28.     I understand that the vast majority of the Workforce relies on their compensation and benefits from the Debtors to pay their daily living expenses and support their families.  Thus, I believe the Workforce could experience significant personal financial hardship if the Debtors are not permitted to continue paying their compensation and providing benefits in the ordinary course.  Consequently, the relief requested therein is necessary and appropriate.

29.     The Debtors are seeking authority to pay and honor certain prepetition claims relating to compensation and benefits programs to avoid immediate and irreparable harm to the

Debtors and to minimize the personal hardship the Workforce would suffer if the Debtors' employee obligations are not paid when due or as expected. Specifically, the Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, payroll and human resource services, wages, salaries, expense reimbursements, other compensation, federal and state withholding taxes and other amounts withheld (including the Employees' share of insurance premiums, taxes, health savings account and flexible spending account contributions, and 401(k) contributions), health insurance, life and accidental death and dismemberment insurance, disability coverage, workers' compensation obligations, retirement benefits, paid time off, and other benefits that the Debtors have historically, directly or indirectly, provided to the Workforce in the ordinary course of business (collectively, the "***Compensation and Benefits Programs***," and such obligations arising therefrom, the "***Compensation and Benefits Obligations***"), as well as all incidental costs thereof.

30.     Subject to the Court's approval of the relief requested in the Wages Motion, the Debtors intend to continue their prepetition Compensation and Benefits Programs in the ordinary course of business and consistent with past practices. The Debtors also request, out of an abundance of caution, the authority to modify, change, and discontinue certain of their Compensation and Benefits Programs and to implement new programs, policies, and benefits, in their discretion and in the ordinary course of business during these Chapter 11 Cases and without the need for further Court approval. A summary of the payments requested to be authorized by this Motion is provided in the table below.

| Relief Sought | Approximate Amount |
|---|---|
| Expense Reimbursements | $1,500 |
| Workers' Compensation Program | $1,400 |

     a.     **Debtors' Payroll and Human Resource Management**: In connection with the Debtors' payroll, Employee benefits, and human resources, the Debtors utilize the services of a professional employer organization ("***PEO***"),

Insperity PEO Services, L.P. ("***Insperity***").  As set forth more fully below, the Debtors employ Insperity to provide comprehensive human resource solutions on an outsourced basis, such as payroll processing, accounting, tax administration, payroll transfer administration, and various administrative services, including administration of the Debtors' 401(k) and Employee medical, dental, vision, and related benefits plans.  Each month, the Debtors pay one lump sum payment to Insperity that covers Employee Wages (as defined below), administrative fees, and benefits plans. Insperity's services are crucial to the smooth functioning of the Debtors' payroll and human resources systems because they ensure that (i) the Employees are paid on time, (ii) source deductions are appropriately determined, (iii) payroll reporting is accurate, and (iv) appropriate amounts are remitted to taxing authorities and other payees.  In addition, Insperity's services are critical to Employee retention as Insperity administers substantially all of the Employees' benefits and the 401(k) program. In connection with Insperity's PEO services, the Debtors pay Insperity approximately $4,100 per month.  As of the Petition Date, I do not believe there are prepetition amounts owed to Insperity.  Out of an abundance of caution, the Debtors seek authority to pay any unpaid amounts to Insperity in the ordinary course of business and consistent with past practices, and to continue paying Insperity on a postpetition basis in the ordinary course of business.

b.   **Employee Wages:** In the ordinary course of business, the Debtors incur and pay the Employees' wages, salaries, and other compensation, on a bi-weekly basis (collectively, the "***Wages***") through Insperity.  The Debtors pay their Employees' Wages on a salaried basis.  On average, the Debtors pay approximately $65,000 per bi-weekly pay period on account of Wages. The Debtors' most recent payroll date occurred on March 6, 2026.  As of the Petition Date, I do not believe there are prepetition amounts owed on account of Wages.  Out of an abundance of caution, the Debtors seek authority to pay any unpaid Wages in the ordinary course of business and consistent with past practices, and to continue paying the Wages and any associated processing costs on a postpetition basis in the ordinary course of business. The Debtors are not aware of any prepetition amounts owed to any individual on account of unpaid Wages that exceed $17,150, the priority expense amount set forth in section 507(a)(4) of the Bankruptcy Code, and the Debtors are not seeking authority to pay Unpaid Wages to any Employee in excess of such amount.

c.   **Independent Contractor Obligations:** In the ordinary course of business, the Debtors incur and pay the Independent Contractors compensation based on an hourly rate and/or a monthly fee (the "***Independent Contractor Obligations***"). The Independent Contractors provide essential project management services to the Debtors.   Amounts owed on behalf of Independent Contractor Obligations are paid by the Debtors on a monthly basis for the work performed in the prior month.   The Debtors pay

approximately $6,000 on account of Independent Contractor Obligations per month. As of the Petition Date, the Debtors do not believe there are prepetition amounts owed on account of Independent Contractor Obligations.  Out of an abundance of caution, the Debtors seek authority to pay any unpaid Independent Contractor Obligations in the ordinary course of business and consistent with past practices, and to continue paying the Independent Contractor Obligations on a postpetition basis in the ordinary course of business.

d.      **Withholding Obligations:** Debtors, through Insperity, routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to other third parties (the "***Withholding Obligations***").  Examples include Social Security, FICA, federal and state income taxes, garnishments, health care payments, other insurance payments, 401(k) contributions, and certain other voluntary payroll deductions.  I believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and therefore are not property of the Debtors' bankruptcy estates.  Thus, I believe the Debtors have authority to direct such funds to the appropriate parties in the ordinary course of business.  Nevertheless, out of an abundance of caution, the Debtors seek authority to continue to honor Withholding Obligations in the ordinary course of business and consistent with past practice.

e.      **Expense Reimbursements:** In the ordinary course of business, the Debtors reimburse Employees for reasonable and customary expenses that such Employees personally incur in the scope of their employment.  Expense reimbursements typically include expenses associated with travel, hotels, motels, meals, cab fare, rental vehicles, or gas and car mileage, and other business-related expenses incurred in the course of an Employee's duties (the "***Expense Reimbursements***").  Generally, Employees personally incur and submit a reimbursement request for such expenses through SAP Concur US ("***Concur***"), the Debtors' expense management services provider.  After the reimbursement request is reviewed and approved, Concur directly reimburses the requesting Employee for eligible Expense Reimbursements, and the Debtors reimburse Concur for such Expense Reimbursements.  The Debtors pay Concur an administration fee of approximately $220 per month. The Debtors' inability to reimburse their Employees with respect to any Expense Reimbursements likely would impose significant hardships on those Employees, as Employees may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit.  Because of the irregular nature of requests for Expense Reimbursements, it is difficult for the Debtors to determine the amount of unpaid Expense Reimbursements at any given time, but historically, the Expense Reimbursements are approximately $8,500 per month.  As of the Petition Date, based on historical practices, the Debtors estimate that the amount of accrued but unpaid Expense Reimbursements is approximately $1,500 (the "***Unpaid Expense Reimbursements***"), all of which will become

due and payable within the first 21 days after the Petition Date.  The Debtors seek authority to pay the Unpaid Expense Reimbursements in the ordinary course of business and consistent with past practices, and, out of an abundance of caution, to continue paying the Expense Reimbursements on a postpetition basis in the ordinary course of business.

f.   **Employee Benefit Programs:** The Debtors provide a comprehensive package of benefits to their Employees through Insperity, including medical, dental, vision, life insurance, and other benefits (collectively, the "***Employee Benefit Programs***") described in more detail below.  The Debtors seek authority to pay all payments and remittances to Insperity for amounts related to the Employee Benefit Programs, including administrative fees, in the ordinary course of business and consistent with past practices, and, out of an abundance of caution, to continue paying the Employee Benefit Programs obligations on a postpetition basis in the ordinary course of business.

    i.   Health and Welfare Programs: The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including the Medical Plans, the Dental Plan, and the Vision Plan (each, as defined below) (collectively, and including any administrative costs related thereto, the "***Health and Welfare Programs***").

        (A)   Medical Plans: The Debtors provide their Employees with medical insurance benefits pursuant to medical plans and self-funded health savings and flexible spending accounts administered by Insperity (the "***Medical Plans***"). Employees have the option to choose among different Medical Plans, coverage, and cost levels.  As of the Petition Date, seven Employees participate in the Medical Plans.

        (B)   Dental Plan: The Debtors offer fully-insured dental coverage through a plan administered by Insperity (the "***Dental Plan***").  Employees, as well as their spouses, children, and/or eligible dependents may be covered under the Dental Plan.  As of the Petition Date, seven Employees participate in the Dental Plan.

        (C)   Vision Plan: The Debtors offer fully-insured vision coverage (the "***Vision Plan***") to their Employees through a plan administered by Insperity.  Employees, as well as their spouses, children, and/or eligible dependents may be covered under the Vision Plan.  As of the Petition Date, seven Employees participate in the Vision Plan.

ii. <u>Life and AD&D Insurance Programs:</u> The Debtors offer fully-insured life and accidental death and dismemberment insurance coverage (the "***Base Life and AD&D Insurance***") to their Employees through Insperity. As of the Petition Date, eight Employees maintain Base Life and AD&D Insurance. Employees may also purchase supplemental life insurance (the "***Supplemental Life Insurance***") and supplemental accidental death and dismemberment insurance (the "***Supplemental AD&D Insurance***," and together with the Supplemental Life Insurance, the "***Supplemental Life and AD&D Insurance***" and, together with the Base Life and AD&D Insurance, the "***Life and AD&D Insurance***") administered by Insperity. The Debtors do not make any contributions on account of the Supplemental Life and AD&D Insurance. As of the Petition Date, one Employee maintains Supplemental Life Insurance and Supplemental AD&D Insurance.

iii. <u>Disability Benefit Programs:</u> The Debtors provide certain Employees with fully-insured short- and long-term disability benefits (the "***Disability Benefits***") administered by Insperity. Employees are eligible for the Disability Benefits as of their date of hire.

iv. <u>Employee Assistance Program:</u> All Employees have access to an employee assistance program (the "***Employee Assistance Program***"), which is offered through Insperity. The Employee Assistance Program provides Employees and their families services and support for personal and work-related issues, including through counseling, legal advice, and referrals.

g. The Debtors pay Insperity approximately $10,100 per month on account of the Health and Welfare Programs, Life and AD&D Insurance, Disability Benefits, and Employee Assistance Program. As of the Petition Date, the Debtors do not believe there are prepetition amounts owed on account of the Health and Welfare Programs, the Life and AD&D Insurance, Disability Benefits, and Employee Assistance Program (the "***Health and Welfare, Life and AD&D Insurance, Disability Benefits, and Employee Assistance Obligations***"). Out of an abundance of caution, the Debtors seek authority to pay any unpaid Health and Welfare Program, Life and AD&D Insurance, Disability Benefits, and Employee Assistance Obligations in the ordinary course of business and consistent with past practices, and to continue paying the Health and Welfare Program, Life and AD&D Insurance, Disability Benefits, and Employee Assistance Obligations on a postpetition basis in the ordinary course of business.

h. <u>Workers' Compensation Program:</u> The Debtors maintain workers' compensation insurance (the "***Workers' Compensation Program***") for Employees at the level required by law in the state of Illinois for claims

arising from or related to their employment with the Debtors and to satisfy the Debtors' obligations arising under or related to the Workers' Compensation Program (the "***Workers' Compensation Obligations***"). The Debtors maintain third-party insurance for Workers' Compensation Obligations through Travelers Property Casualty Company of America ("***Travelers***" and, together with Insperity and Concur, the "***Compensation and Benefits Providers***"). All non-executive Employees are included in the Workers' Compensation Program. The Debtors pay an annual premium of approximately $19,000 to Travelers. As of the Petition Date, the Debtors estimate that there are no open claims in the Workers' Compensation Program. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these Chapter 11 Cases. As of the Petition Date, I believe that approximately $1,400 in Workers' Compensation Obligations has accrued and is outstanding (the "***Unpaid Workers' Compensation Obligations***"), all of which will become due and payable within the first 21 days after the Petition Date. The Debtors seek authority to pay the Unpaid Workers' Compensation Obligations in the ordinary course of business, consistent with past practices, and to continue paying the Workers' Compensation Obligations on a postpetition basis in the ordinary course of business and consistent with past practice. To the extent any Employee asserts new claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

i.   Paid Leave: The Debtors maintain certain paid leave benefit programs for Employees, providing paid leave for PTO and Other Leave (each as defined below, and collectively, the "***Leave Benefits***"). In the ordinary course of business, the Debtors provide paid time off ("***PTO***") to eligible Employees. PTO accrues at a specified rate dependent upon either (a) the agreed upon amount in the Employee's employment agreement or (b) if no applicable language in the employment agreement, each Employee's number of years of service. Employees accrue between 10 and 30 days of PTO each year. In the event that an Employee's available PTO is not used by the end of the calendar year, the applicable Employee may carry over hours to the next calendar year, subject to certain maximum balance capacities calculated based on each Employee's years of service. Upon termination, eligible Employees are entitled to cash payments for all accrued but unused PTO. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid PTO obligations is approximately $50,000. However, this amount is not a current cash pay obligation because Employees are only entitled to be paid for accrued and unused PTO in the event they resign or

are terminated.  Because PTO is an essential feature of the employment package provided to the Debtors' Employees, and failure to provide this benefit would harm Employee morale and encourage the premature departure of valuable Employees, the Debtors request authority to honor all of their PTO obligations consistent with past practices, and, out of an abundance of caution, to continue honoring such PTO obligations on a postpetition basis in the ordinary course of business. In the ordinary course of business, the Debtors provide certain other paid and unpaid leave, including holidays, bereavement, jury duty, voting leave, military leave, leave provided for under the Family Medical Leave Act, parental leave, and all legally required leaves (collectively, the "***Other Leave***").  Employees are not entitled to any cash payments in connection with the Other Leave. I believe that the continuation of the Leave Benefits in the ordinary course of business and consistent with past practices is essential to maintaining Employee morale during these Chapter 11 Cases.  Further, the policies are broad-based programs upon which all Employees have come to depend.  As a result, out of an abundance of caution, the Debtors seek authority to continue offering and honoring the Leave Benefits on a postpetition basis and in the ordinary course of business.

j.    401(k) Plan: The Debtors provide all eligible Employees with the ability to participate in a defined contribution 401(k) plan (the "***401(k) Plan***"), which is provided and administered by Insperity.  Employees generally are eligible to participate in the 401(k) Plan immediately upon employment.  The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Employee contributions to the 401(k) Plan are deducted automatically from each paycheck by Insperity and transferred to a trust established under the 401(k) Plan (collectively, the "***401(k) Deductions***").  As of the Petition Date, nine Employees contribute to the 401(k) Plan and eight former Employees hold balances in the 401(k) Plan.   The Debtors make discretionary contributions to the 401(k) Plan by matching 4% of Employees' contributions (the "***401(k) Matching Contributions***" and, together with the 401(k) Deductions, the "***401(k) Obligations***"). As of the Petition Date, the Debtors do not believe there are prepetition amounts owed on account of the 401(k) Obligations.  Out of an abundance of caution, the Debtors seek authority to remit and/or pay any unpaid 401(k) Obligations in the ordinary course of business and consistent with past practices, and to continue remitting and/or paying the 401(k) Obligations on a postpetition basis in the ordinary course of business.

31.    I understand that the payment of certain Compensation and Benefits Obligations is required by law and that the Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities because these amounts principally represent Employee or

Independent Contractor earnings that governments, Employees, Independent Contractors, and judicial authorities have designated for deduction and withholding from the Workforce's paychecks.

32.     I believe the Workforce will be exposed to significant financial difficulties if the Debtors are not permitted to honor unpaid Compensation and Benefits Obligations.  Additionally, I believe that continuing ordinary course benefits will help maintain morale and minimize the adverse effect of the commencement of these Chapter 11 Cases on the Debtors' business.

33.     The Workforce provides the Debtors with services necessary to conduct the Debtors' businesses, and the I believe that absent the payment of the obligations owed to the Workforce, turnover and instability may result at this critical juncture in these Chapter 11 Cases.  I further believe that without these payments, the Workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships the Workforce may face.  The Workforce may then elect to seek alternative employment opportunities.  Additionally, I believe a significant portion of the value of the Debtors' businesses is tied to the skills of the Workforce, which cannot be replaced without significant efforts, and which efforts may not be successful given the overhang of these Chapter 11 Cases.  I believe that enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.

34.     I therefore believe that (a) payment of the prepetition Compensation and Benefits Obligations and (b) continuation of payment of the same on a postpetition basis is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retaining their Workforce throughout these Chapter 11 Cases.

35.     I believe the Debtors have sufficient liquidity to pay the amounts described in this Motion in the ordinary course of business.  In addition, I believe under the Debtors' existing cash

management system, the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the Compensation and Benefits Obligations.  Accordingly, I believe there is minimal risk that checks, wire transfers, and electronic fund transfer requests that the Court has not authorized will be honored inadvertently.  The Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, wire transfers, or electronic fund transfer requests in respect of the relief requested in this Motion.  Further, the Debtors also seek authority to issue new postpetition checks, wire transfers, or electronic fund transfer requests to replace any prepetition checks, wire transfers, or funds transfers that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases.

36.     Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Wages Motion be approved.

**B.     Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue Using Existing Checks and Business Forms, (C) Maintain Their Corporate Card Program, and (D) Continue Intercompany Transactions, and (II) Granting Related Relief (the *"Cash Management Motion"*)**

37.     The Debtors seek entry of an interim and final order, substantially in the forms attached to the Cash Management Motion, (i) authorizing the Debtors to: (a) continue to operate their cash management system and maintain existing bank accounts, (b) continue using their existing checks and business forms, (c) maintain their corporate card program, and (d) continue to engage in intercompany transactions; and (ii) granting related relief.  In addition, the Debtors respectfully request that the Court schedule a hearing to consider approval of this Motion on a final basis.

38.     The Debtors manage their cash, receivables, and payables, in the ordinary course of business, through a centralized cash management system, including the use of certain third-party

processors (the "***Cash Management System***").  The Debtors use the Cash Management System to efficiently collect, transfer, concentrate, and disburse funds received.  The Cash Management System also enables the Debtors to monitor the collection and disbursement of funds and the administration of their bank accounts, which are maintained at Texas Capital Bank ("***TCB***" or the "***Bank***").  The Debtors maintain accounting controls with respect to each of their bank accounts and are able to accurately trace the funds through their Cash Management System to ensure that all transactions are adequately documented and readily ascertainable, including in connection with the intercompany transactions more fully described below.  The Debtors will continue to maintain their books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date.  Accordingly, the Debtors will be able to accurately document, record, and track the transactions occurring within the Cash Management System for the benefit of their bankruptcy estates.

39.     The Debtors' Cash Management System consists of a total of five bank accounts (collectively, the "***Bank Accounts***"),[3] all of which are maintained at TCB.  Of the Bank Accounts maintained at TCB, three are maintained by and held in the name of Debtor Viridis Chemical, LLC ("***Viridis Chemical***"); one is maintained by and held in the name of Debtor Viridis Chemical Payroll, LLC; and one is maintained by and held in the name of Debtor Viridis Chemical NE Asset Co 1, LLC ("***Asset Co***").

40.     A list identifying each of the Bank Accounts, along with the type of account, the Bank at which such account is held, and the last four digits of each account number, is attached to the Cash Management Motion as Exhibit C and a diagram depicting the Cash Management System,

---

[3]     For the avoidance of doubt, this Motion applies to all of the Debtors' Bank Accounts irrespective of whether or not such account is specifically identified herein.

the relationship between the Bank Accounts, and the general flow of funds is attached to the Cash

Management Motion as Exhibit D.   A general description of the Debtors' Bank Accounts is

provided in the table below:

| Bank Accounts | Description of Accounts |
|---|---|
| **Viridis Chemical, LLC** | |
| **Viridis Chemical Operating Account** Account Ending: 5775 | This account is primarily used for the day-to-day operating disbursements (ACH (as defined below), wires, auto drafts) of Viridis Chemical, including taxes and other expenses.  Viridis Chemical vendor and project related payments are disbursed out of this account and accounts receivable are received into this account. |
| **Money Market Account** Account Ending: 9828 | This account is an interest bearing account primarily used to hold funds from capital calls until needed for disbursements, and capital calls are received in this account. |
| **Security Account** Account Ending: 2206 | This account is primarily used as security for the Debtors' corporate credit cards. Disbursements from this account are rare. |
| **Viridis Chemical Payroll, LLC** | |
| **Payroll Account** Account Ending: 0954 | This account is primarily used to fund employee payroll and related amounts to the Debtors' co-employer, Insperity PEO Services, L.P. ("***Insperity***").  Payroll and related amounts are funded into this account and disbursed to Insperity to remit to employees. |
| **Viridis Chemical NE Asset Co 1, LLC** | |
| **Asset Co Operating Account** Account Ending: 0947 | A small number of Asset Co disbursements are made from this account. |

41.     To the best of my knowledge, as of the Petition Date, the Debtors' Bank Accounts

had a combined value of approximately $2.3 million.

42.     The Debtors respectfully request that the Court authorize the Debtors to continue

to operate their Cash Management System and maintain and continue to use the Bank Accounts,

and authorize the Bank to maintain, service, and administer the Bank Accounts without

interruption and in the ordinary course of business.  In this regard, the Debtors respectfully request

that the Bank be authorized to receive, process, honor, and pay any and all checks, drafts, wires,

credit card payments, automated clearing house ("***ACH***") transfers, and other instructions, payable

through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or

other parties entitled to issue instructions with respect thereto, provided that sufficient funds are on deposit in the applicable Bank Accounts to cover such payments.

43.     To the best of my knowledge, all of the Debtors' Bank Accounts are maintained at a Bank that is insured by the Federal Deposit Insurance Corporation (the "***FDIC***").

44.     I understand that the U.S. Trustee has established certain operating guidelines (the "***U.S. Trustee Guidelines***") for debtors-in-possession. I further understand the U.S. Trustee Guidelines require, among other things, that upon the filing of a bankruptcy petition, a debtor must immediately close all of its existing bank accounts and open new bank accounts that are designated as debtor-in-possession accounts with authorized depositories whose deposits are insured by the FDIC and who agree to comply with the requirements of the U.S. Trustee's office.  The U.S. Trustee Guidelines further require debtors to maintain one account solely for the purpose of setting aside estate monies required for the payment of taxes and another separate account for cash collateral.  Here, the Debtors maintain all of their deposits with TCB, which is an authorized depository institution in the Southern District of Texas.

45.     In the ordinary course of business, the Debtors incur and pay, or allow to be deducted from the appropriate Bank Accounts, certain fees and expenses related to the cost of administering the Bank Accounts, including, *inter alia*, wire transfers and other fees, costs, and expenses standard for typical corporate bank accounts, letters of credit, and cash management systems (collectively, the "***Bank Fees***").  The Bank Fees are either debited directly from the Debtors' Bank Accounts or are paid on a per transaction basis.  The amount of Bank Fees owed each month varies based on account activity and average monthly balance maintained in the Bank Accounts.  Historically, the Debtors have paid *de minimis* monthly Bank Fees.  As of the Petition Date, I believe that a *de minimis* amount of Bank Fees may have accrued and is outstanding,

approximately all of which will become due and payable within the first 21 days after the Petition Date.

46.     As part of the Cash Management System, the Debtors utilize preprinted checks and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks collectively, the "***Checks and Business Forms***") in the ordinary course of their business. To minimize expenses to their estates and avoid confusion on the part of employees, customers, and vendors during the pendency of these Chapter 11 Cases, the Debtors respectfully request that the Court authorize their continued use of all correspondence and Checks and Business Forms as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Checks and Business Forms as required under the U.S. Trustee Guidelines.  To the extent the Debtors exhaust their existing supply of Checks and Business Forms during these Chapter 11 Cases, the Debtors will transition to using Checks and Business Forms with the designation "debtor-in-possession" and the corresponding bankruptcy case number on all such forms. I believe waiver of the requirement to immediately purchase new Checks and Business Forms that include the term "debtor-in-possession" will avoid disruption of the Cash Management System and unnecessary expense, and the parties in interest will not be prejudiced by such relief.

47.     As part of the Cash Management System, and in the ordinary course of business, the Debtors maintain company-paid credit cards (the "***Corporate Cards***") that are utilized to pay for certain work-related expenses, such as certain recurring subscriptions and non-recurring purchases made on behalf of the Debtors, and certain operating expenses on behalf of the Debtors (collectively, the "***Corporate Card Program***").  The Corporate Cards are issued by TCB (the

"*Corporate Card Provider*").  As of the Petition Date, three Corporate Cards have been issued by TCB to the Debtors and their employees.

48.     In general, Corporate Cards are issued to employees for use on the Debtors' behalf for the payment of business-related expenses that are verified through receipts.  The Debtors receive monthly statements for purchases (the "*Corporate Card Expenses*") made with the Corporate Cards in the preceding month.  Once the Debtors determine that the Corporate Card Expenses comply with the Debtors policies and procedures, the Debtors typically pay any outstanding Corporate Card Expenses within 16 days of each statement date.

49.     Over the last 12 months, the Debtors have incurred a monthly average of up to approximately $4,500 of Corporate Card Expenses, including related *de minimis* fees, and have paid the full balance owed approximately 16 days after each monthly statement date.  As of the Petition Date, I believe that approximately $3,000 in Corporate Card Expenses has accrued and is outstanding, all of which will become due and payable within the first 21 days after the Petition Date.

50.     Use of the Corporate Cards is an integral part of the Debtors' Cash Management System, and I believe continuation of the ability of the Debtors' employees to use the Corporate Cards is essential to the Debtors' businesses.  I believe the Debtors' inability to maintain the Corporate Card Program could impose a hardship on the Debtors' businesses and would likely impose significant hardship on the Debtors' employees.  The Debtors rely on the ability of their employees to pay for expenses incurred in the ordinary course of business and to make other reasonable work-related purchases necessary to fulfill their day-to-day professional obligations.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue the

Corporate Card Program in the ordinary course of business and to pay any prepetition or postpetition Corporate Card Expenses or fees with respect to the Corporate Card Program.

51.     In the ordinary course of business, the Debtors maintain business relationships with each other, conducting intercompany transactions (collectively, the "*Intercompany Transactions*") from time to time that result in intercompany receivables and payables (the "*Intercompany Claims*").  As described above, the Debtors manage their expenses and revenues through a centralized Cash Management System.  The Debtors track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transactions and will continue to do so postpetition.

52.     At any given time there may be Intercompany Claims owing by one Debtor to another Debtor.  Intercompany Transactions are made periodically to reimburse certain Debtors for various expenditures associated with their businesses or to fund certain Debtors' accounts in anticipation of certain upcoming expenditures, as needed.  For example, in the operation of the Cash Management System, the Debtors transfer funds from the Viridis Chemical Operating Account (5775) to the Payroll Account (0954) and the Asset Co Operating Account (0947).

53.     I believe the Intercompany Transactions are necessary due to the corporate structure and Cash Management System of the Debtors.  This system not only maximizes efficiency but also simplifies third-party interactions with the Debtors as an enterprise.  If the Intercompany Transactions were to be discontinued, I believe the Cash Management System and the Debtors' financial operations would be unnecessarily disrupted to the detriment of the Debtors' estates.  I further believe that continuing the Intercompany Transactions is essential and is in the best interests of the Debtors' respective estates and creditors.  Accordingly, to preserve value for the Debtors' estates, the Debtors seek authority to continue the Intercompany Transactions in the

ordinary course of business postpetition, consistent with the Debtors' customary prepetition practices.

54.     I believe requiring the Debtors to adopt new cash management systems and open new bank accounts at the same or different depository institutions would be expensive, impose needless administrative burdens on the Debtors, and would cause undue disruption to the Debtors' financial operations.  Further, I believe any such disruption would have a severe and adverse impact upon the Debtors' ability to navigate these Chapter 11 Cases, adversely affecting the Debtors' ability to maintain and maximize value for the benefit of creditors and other parties in interest.  Moreover, I believe that such a disruption would be wholly unnecessary insofar as the continued use of the Debtors' Bank Accounts and Cash Management System provides a safe, efficient, and established means for the Debtors to maintain and manage their cash.

55.     The Debtors submit that a waiver of certain requirements of the U.S. Trustee Guidelines is appropriate.  I believe maintenance of the Bank Accounts and Cash Management System will minimize the disruption to the Debtors' business and promote an orderly and efficient transition into chapter 11.  The Cash Management System constitutes an ordinary-course and essential business practice providing significant benefits to the Debtors, including the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, reduce borrowing costs and administrative expenses by facilitating the movement of funds, and ensure the availability of timely and accurate account balance information consistent with prepetition practices.

56.     I believe that the failure to receive the relief requested in the Cash Management Motion, including authorization to continue to operate their Cash Management System, maintain and continue to use the Bank Accounts, continue, using existing checks and business forms,

continue the Corporate Card Program, and continue the Intercompany Transactions in the ordinary course of business postpetition, consistent with the Debtors' customary prepetition practices, would imperil the Debtors' restructuring and cause irreparable harm. Accordingly, on behalf of the Debtors, I respectfully request that the Cash Management Motion be approved.

### C.   Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Taxes and Fees and (II) Granting Related Relief (the "*Taxes Motion*")

57.      By the Taxes Motion, the Debtors seek entry of an order (a) authorizing the Debtors to remit and pay (or use tax credits to offset) certain accrued and outstanding prepetition taxes and fees that will become payable during the pendency of these Chapter 11 Cases in the ordinary course of business and (b) granting related relief.   In addition, for the avoidance of doubt, the Debtors seek authority to pay taxes and fees for so-called "straddle" periods. [4]

58.      In the ordinary course of business, the Debtors collect, withhold, or incur property taxes, franchise and income taxes, sales, use, and excise taxes, as well as certain other administrative, governmental, and regulatory fees and assessments (collectively, the "***Taxes and Fees***").   The Debtors remit and pay the Taxes and Fees to various federal, state, and local governments, including taxing authorities (collectively, the "***Authorities***").   A schedule identifying the Authorities is attached to the Taxes Motion as Exhibit B.   The Debtors remit and pay the Taxes and Fees through electronic funds transfers that are processed through their banks and other financial institutions.

59.      As of the Petition Date, I believe that approximately $2,000 in Taxes and Fees has accrued and is outstanding, approximately $700 of which will become due and payable within the first 21 days after the Petition Date.   Such estimated Taxes and Fees are summarized below.

---

[4]      The Debtors reserve their rights with respect to the proper characterization of any "straddle" taxes and fees and to seek reimbursement of any portion of any payment made that ultimately is not entitled to administrative or priority treatment.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days After the Petition Date |
|---|---|---|---|
| Property Taxes | Taxes and obligations related to real and personal property holdings | $1,300 | $0 |
| Franchise and Income Taxes | Taxes required to conduct business in the ordinary course and taxes on net corporate income | $0 | $0 |
| Sales, Use, and Excise Taxes | Taxes related to the sale and use of certain goods and services | $700 | $700 |
| Regulatory Fees, Annual Report Fees, and Other Miscellaneous Taxes | Taxes and fees related to business, administrative, environmental, and regulatory assessments | $0 | $0 |
| | | $2,000 | $700 |

60.     The Debtors incur various state and local property taxes against the Debtors' real and personal property (collectively, "***Property Taxes***").  The Debtors are required to remit and pay Property Taxes on an annual basis to avoid the imposition and/or enforcement of statutory liens on their real or personal property.  In 2025, the Debtors paid approximately $1,095 on account of Property Taxes. As of the Petition Date, the Debtors submit that approximately $1,300 in Property Taxes has accrued and is outstanding, none of which will become due and payable within the first 21 days after the Petition Date.

61.     The Debtors incur various state and local franchise taxes on account of doing business in certain states and certain communities ("***Franchise Taxes***").  The Debtors are required to remit and pay Franchise Taxes in order to remain in good standing and continue conducting their businesses pursuant to applicable state and local laws.   The Debtors also incur various corporate income taxes on their taxable net income (collectively, "***Income Taxes***").  Income Taxes are generally calculated as a percentage of net or gross income, as applicable.  The Debtors are

required to remit and pay Income Taxes on an annual basis in order to remain in good standing and continue conducting their businesses pursuant to applicable federal, state, and local laws.  In 2025, the Debtors paid approximately $95 on account of Franchise Taxes and Income Taxes. As of the Petition Date, the Debtors are unaware of any accrued and outstanding Franchise Taxes or Income Taxes.  However, out of an abundance of caution, to the extent any such amounts become due on a postpetition basis, the Debtors seek authority to pay such amounts in the ordinary course of business and consistent with past practice.

62.     The Debtors collect or incur various state and local taxes in connection with the processing, sale, and distribution of products in the chemicals market, and other related services (collectively, "***Sales, Use, and Excise Taxes***").  I understand that Sales, Use, and Excise Taxes are essentially general consumption taxes charged at the point of purchase for certain goods and services, which are usually set up by the applicable Authority as a percentage of the price of the good or service purchased, and may also be charged for certain activities such as highway transportation.  Additionally, the Debtors have historically purchased a variety of equipment, materials, and supplies necessary for the operation of their businesses from vendors who may not operate in the state where the property is to be delivered and, therefore, do not charge the Debtors sales tax in connection with such purchases.  In these cases, I understand that applicable law generally requires the Debtors to subsequently remit and pay use taxes on such purchases.  The Debtors are required to remit and pay Sales, Use, and Excise Taxes on an annual basis, as applicable.  In 2025, the Debtors paid approximately $150 on account of Sales, Use, and Excise Taxes. As of the Petition Date, the Debtors submit that approximately $700 in Sales, Use, and Excise Taxes has accrued and is outstanding, all of which will become due and payable within the first 21 days after the Petition Date.

63.     The Debtors may incur, in the ordinary course of business, certain regulatory fees, annual report fees, permitting fees, licensing fees, levies, and other miscellaneous taxes and fees in accordance with state and/or local laws (the "***Regulatory Fees and Other Miscellaneous Taxes***").  For example, the Debtors pay an annual franchise fee to the Delaware Secretary of State in the amount of $1,500.00, and anticipate that such fee will come due in May of 2026.  The Debtors seek authority to remit and pay this and any similar fees to the relevant Authorities on a timely basis as required by the relevant Authorities.  As of the Petition Date, the Debtors are unaware of any accrued and outstanding Regulatory Fees and Other Miscellaneous Taxes. However, out of an abundance of caution, to the extent any such amounts become due on a postpetition basis, the Debtors seek authority to pay such amounts in the ordinary course of business and consistent with past practice.

64.     As of the Petition Date, the Debtors are not subject to any ongoing audit investigations but may be subject to future audit investigations by certain Authorities on account of tax returns and/or obligations from prior years (collectively, "***Audits***").  The Authorities performing any Audits may seek to impose additional prepetition Taxes and Fees, including interest on late payment of taxes (if applicable) (such additional Taxes and Fees, the "***Assessments***").  Additionally, the Debtors may contest Audits and Assessments in appropriate judicial or administrative proceedings, as well as the amount that may need to be posted as collateral to contest asserted Assessment amounts.  The Debtors expressly state that nothing in this Motion or any related order constitutes or should be construed as an admission of liability by the Debtors with respect to any Audit or Assessment.  Furthermore, the Debtors expressly reserve all rights with respect to any Audit or Assessment and reserve the right to contest and/or appeal any Assessment as a result of any Audit.

65.     Although paying the Taxes and Fees is critical to the Debtors' ability to maintain the value of their estates, the Debtors may have appropriate grounds and wish to contest certain Taxes and Fees.  As such, the Debtors respectfully request that such relief granted in this Motion be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate or the Debtors' ability to request further relief related to the Taxes and Fees in the future.  The Debtors propose that prior to making a payment to any of the Authorities under this Motion, the Debtors be authorized, in their discretion, to settle all or some of the prepetition claims of such Authorities for less than their face amount without further notice or hearing.

66.      If certain of the Taxes and Fees are not paid, I understand that the Debtors' officers and directors may be subject to lawsuits during the pendency of these Chapter 11 Cases.  I believe such lawsuits would prove distracting for the Debtors and the named officers and directors, whose immediate and full-time attention to the Debtors' Chapter 11 Cases and sale process is required to ensure a swift restructuring.  Accordingly, I believe it is in the best interest of the Debtors' estates to eliminate the possibility of such time-consuming, costly, and potentially damaging distractions.

67.     I believe it is a sound exercise of the Debtors' business judgment to pay the Taxes and Fees as the Debtors' failure to remit and pay the Taxes and Fees could have a material adverse impact on the Debtors and their estates.  Among other things, the Authorities could attempt to impose penalties and fees, pursue time and resource-consuming audits, file liens, and/or pursue lift stay motions if the Taxes and Fees are not paid.  As such, I believe only the prompt and regular payment of the Taxes and Fees will avoid these and other unnecessary governmental actions.

68.     I believe the Debtors have sufficient liquidity to pay the amounts described in this Motion in the ordinary course of business.  In addition, under the Debtors' existing cash

management system, I believe the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the Taxes and Fees. Accordingly, the Debtors submit that there is minimal risk that checks, wire transfers, and electronic fund transfer requests that the Court has not authorized will be honored inadvertently. The Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, wire transfers, or electronic fund transfer requests in respect of the relief requested in this Motion. Further, the Debtors also seek authority to issue new postpetition checks, wire transfers, or electronic fund transfer requests to replace any prepetition checks, wire transfers, or funds transfers that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases.

69.     For the reasons stated above, I believe that the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm to the Debtors. It is my understanding that the Debtors have sufficient liquidity to pay the amounts described in the Taxes Motion in the ordinary course of business. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**D.     Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage on a Postpetition Basis in the Ordinary Course; and (II) Granting Related Relief (the "*Insurance Motion*")**

70.     In the Insurance Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) continue their prepetition insurance coverage and satisfy prepetition obligations related thereto and (ii) renew, amend, supplement, extend, or purchase insurance coverage on a postpetition basis in the ordinary course; and (b) granting related relief.

71.     The Debtors maintain six insurance policies (collectively, the "*Insurance Policies*") through five third-party insurance carriers (collectively, the "*Insurance Carriers*") in

the ordinary course of their businesses.  The insurance policies provide coverage for, among other things, losses related to the Debtors' real and personal property, professional and general liability, crime liability, cyber risk, directors' and officers' liability, automobile liability, and pollution and environmental liability.   In addition, certain of the Insurance Policies provide layers of excess liability coverage.  A schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit B.

72.     It is essential that the Debtors have the ability to continue or renew the Insurance Policies and enter into new insurance policies or agreements to preserve the value of their estates. In many cases, regulations, laws, and contract provisions that govern the Debtors' activities require the types of coverage provided under the Insurance Policies.  In addition, the Bankruptcy Code and the operating guidelines issued by the United States Trustee for Region 7 (the "**U.S. Trustee Guidelines**") require the Debtors to maintain certain insurance coverage.  I believe the relief requested in this Motion is necessary to ensure uninterrupted coverage under the Insurance Policies.  Accordingly, the Debtors respectfully request authority to maintain the existing Insurance Policies, pay prepetition obligations related thereto upon entry of the Order, and renew, amend, supplement, extend, or purchase new Insurance Policies on a postpetition basis in the ordinary course of business.

73.     The Debtors, in the ordinary course of business,  incur obligations to pay premiums (collectively, the "**Insurance Premiums**") for the Insurance Policies based upon a fixed rate established and billed by their respective Insurance Carriers.  The Debtors pay an aggregate amount of approximately $300,000 in Insurance Premiums each year, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions. The Debtors pay the Insurance Premiums as they come due in the ordinary course of business pursuant to various

coverage terms which, along with the term of each of the Insurance Policies, the categories of insurance coverage, the Insurance Carriers' names, and the policy numbers, are provided on the schedule of Insurance Policies attached to the Insurance Motion as Exhibit B.

74.     The Debtors pay the Insurance Premiums related to two of the Insurance Policies as lump sum payments.  The Debtors estimate that, as of the Petition Date, there are no outstanding amounts due on account of these Insurance Premiums.  However, out of an abundance of caution, the Debtors respectfully request authority to honor any amounts which may become due on a postpetition basis in the ordinary course of business, as making these payments is necessary to prevent cancellation of the Insurance Policies and to preserve the value of the Debtors' estates by mitigating the significant risks associated with any lapse in coverage, to the benefit all stakeholders.

75.     The Debtors utilize a financing agreement to finance four of their Insurance Premiums (the "***Premium Financing Agreement***").  The Premium Financing Agreement is serviced by AFCO Premium Credit LLC ("***AFCO***").  Further detail regarding the Premium Financing Agreement is provided in the schedule attached to the Insurance Motion as Exhibit C. The Debtors estimate that, on average, they pay approximately $260,000 annually to AFCO under the Premium Financing Agreement.  As of the Petition Date, approximately $224,000 is outstanding pursuant to existing Premium Financing Agreement, approximately $26,000 of which will come due on March 28, 2026.

76.     The Premium Financing Agreement provides a cost-effective and convenient way for the Debtors to finance these costly insurance policies and avoid the burden of paying a large lump sum upfront.  However, I believe that AFCO may cancel the Premium Financing Agreement if the Debtors do not timely pay the installment payments.  Accordingly, paying the installment

payments (and thereby avoiding the potential cancellation of the Premium Financing Agreement) is essential to preserving the value of the Debtors' estates from substantial risk in the event of a cancellation, and accordingly is to the benefit of each of the Debtors' stakeholders.

77.     Finally, the Debtors incur various fees, taxes, and deductibles related to their Insurance Policies (together with the Insurance Premiums, the "***Insurance Obligations***").  As of the Petition Date, the Debtors estimate that no amounts are owed on account of prepetition fees, taxes, or deductibles related to their Insurance Policies; *provided*, *however*, to the extent the Debtors subsequently determine that any prepetition amounts are owed on account of such fees, taxes, or deductibles, the Debtors respectfully request  authority to pay such amounts in the ordinary course of business.

78.     The Debtors respectfully request authority to pay all prepetition outstanding Insurance Obligations in the ordinary course of business and consistent with past practice.  In addition, out of an abundance of caution, the Debtors respectfully request  authority to continue to honor the Insurance Obligations as they come due on a postpetition basis in the ordinary course of business and consistent with past practice.

79.     I believe it is essential to the Debtors' estates the Debtors be permitted to maintain the Insurance Policies and continue making necessary payments in connection therewith.  I believe it is similarly critical that the Debtors have the authority to renew, amend, supplement, extend, or purchase the Insurance Policies in the ordinary course of business as needed, in their business judgment, without further order of the Court.

80.     I believe it is essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under any of the Insurance Policies could result in one or more of the Insurance Carriers

terminating or seeking to terminate the existing Insurance Policies, declining to renew the Insurance Policies, or refusing to enter into new insurance policies with the Debtors in the future.

81.    If the Insurance Policies are allowed to lapse or terminate, I believe the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the value of the Debtors' estates.  Furthermore, the Debtors would be required to obtain replacement policies on an expedited basis at what would likely be a significantly higher cost to their estates.  Accordingly, the Debtors seek authority to make all payments with respect to the Insurance Policies that the Debtors determine, in the exercise of their reasonable business judgment, must be paid in order to avoid any lapse or termination in coverage.

82.    The Debtors have sufficient liquidity to pay the amounts described in this Motion in the ordinary course of business.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the Insurance Obligations.  Accordingly, the Debtors submit that there is minimal risk that checks, wire transfers, and electronic fund transfer requests that the Court has not authorized will be honored inadvertently.  The Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, wire transfers, or electronic fund transfer requests in respect of the relief requested in this Motion.  Further, the Debtors also seek authority to issue new postpetition checks, wire transfers, or electronic fund transfer requests to replace any prepetition checks, wire transfers, or funds transfers that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases.